Mr. Southerland, thank you for your attention. Could it please the Court, Counsel? We are bringing three theories before this Court to hold Dr. Al-Shami and Advanced Correctional Health liable, ACH. We believe that he is liable if you apply the Fourth and Fourteenth Amendment, Objective of Unreasonable Treatment, and dealing with his DTs under Kingsley. We believe that under Shields, which we've raised, that the liability should reach to ACH under 1983. And we believe that the state tort of medical negligence should be able to proceed because the Court applied the wrong standards and the wrong law when we did not have a specific expert. Dr. Al-Shami placed Mr. Collins in a padded cell naked with only a mat, suffering from severe DTs. No vital signs were taken for five days. No medical charting occurred for five days. Dr. Al-Shami abdicated his role of primary care provider and his responsibility to actively monitor the vital signs leading to the emergency condition of Mr. Collins. Can you speak to this issue of the protocol sheets and who is responsible for them, who signed them, the impact they have as it relates to the standard of care? Yes. The protocol sheet, this is often an issue raised by Judge Easterbrook, is not in and of itself a violation, but it helps establish what the standard is. So in 2010, Mr. Collins was admitted into the same jail with the same condition, and Dr. Al-Shami signed that protocol sheet. When we asked him during the deposition, he didn't even recognize it. He said each jail changes their own, has their own form. I said, no, this is ACH's form. He said, well, they change it all the time. They don't pay any attention to it. He disavowed it. I use the best medical standards. Well, the best medical standards are set forth in this protocol sheet. Which is the one that says every four hours vitals get checked the first day and then at least once every shift for subsequent days. Yes, and it actually goes on to explain exactly what that means when you say monitoring. It says, follow-up medical, vital signs, monitor every four hours for the first day, then every shift while on medication. Next line, place the detainee in holding observation cell. So monitoring means taking vital signs. So your position is even though you didn't have any expert testimony, it's just obvious that there was a violation because the vital signs weren't taking and the reports were given in terms of how his condition was deteriorating. Vital signs are the only way you can measure a deterioration. You can do it by observation, looking for people, in this case a video camera. But the vital signs are the only way you can tell about a person's temperature. He was taken to the hospital with a body temperature of 84.2. In another case that preceded this, in Henry County, that person died and died of hypothermia in 2010. The same kind of problem. Mr. Collins could have been that 5% of severe DT inmate patients who die. And what Dr. Alshami's practice is about is call me when there's an emergency. His office constitutes a car and a cell phone. And in Indiana, a cell phone is a pretty spotty situation if you're trying to stay in touch with people. He visited 20 jails a week. Do the math. Pretty hard to see anybody. He spent 90 seconds. The only time he saw Mr. Collins was on the 17th and he saw him 90 seconds in the cell reattached by physically filing a video of that. The records show that there was no medical charting whatsoever for five days after he came back from the emergency room the first time until Dr. Alshami saw him on the 17th. So from the 17th, when he had only partial vital signs, namely the blood pressure and the heart rate, he did not take anything else, there were no vital signs taken. And in fact, he was told there were no vital signs taken before that. I may have missed it, but was there an explanation in the brief as to why no expert was called on his behalf? You didn't miss it. Sometimes it's just money. But we had what I often do, Judge, is I use the treating physicians as experts and I use the treating physician of Dr. Alshami. And the problem is none of the treating experts said it breached the standard of care not to monitor or direct others to monitor him. And so I'm back to my original question. Your case, you're resting it on the absence of following those, the monitoring and not checking, and saying that it's just obvious given what his medical history was, given what his condition was, that you meet the objective unreasonableness standard. No, that's not a correct reading of our brief, Judge. What we did say was if you look at Dr. Guppy, who was the treating physician on the 15th, if you look at Dr. White, who was the emergency room and treating physician on the 23rd, and Dr. Olson, all of them said if you take Dr. Alshami's treatment, it starts off okay. In other words, you monitor him in a cell and you give him these medications, thiamine, multivitamins, and lithium if necessary, and you monitor his, they're supposed to monitor his vital signs because that's what they say in their title testimony. So you have to go back and look at the entire testimony of what they actually said. Now, if you look at Dr. Alshami's testimony, he couldn't believe that Dr. Guppy sent him back. He said it's wrong. He said he shouldn't have been sent back, but they do it all the time. And one of the reasons they sent him back is they don't have the facility to take an inmate who has to have security. They sent him back. So what did they do in this case? They just don't want him. So they don't have to worry about security and they don't have to worry about paying the bill. And yet he's in emergency care. This is a for-profit business. This is a cottage industry where people make money off the misery and the medical problems, complicated medical problems of individuals in their custody. So if you look at just the testimony cited by the defendants, you can probably conclude that there was no assertion that the requirements are there for constant monitoring. But if you read the whole testimony, Judge Williams, you will find that they said, that's the way you start out, but obviously it can deteriorate if you don't monitor. And monitoring has to include taking the vital signs. And so like Dr. Light, he's one of the people you rely on, right? That is true. So at the deposition he stated he could not opine whether Dr. A, I've just got the short for it right, whether he had met the standard of care because he didn't have access to the dosing or duration or how often he'd been checked. That's right, because he didn't have that because there was nothing to look at. And Guffey says the ER doc who treated Collins said the vitals helped him determine whether an individual has DTs. And then Olson confirmed that the doctor's treatment alone wasn't enough, but he couldn't give a definitive opinion regarding the severity of the condition because he didn't have the vital signs from when Collins was in jail. Exactly. Doesn't it suggest that you need the vital signs? I'd like to reserve the remainder of my time unless there is some question that needs to be answered right now. Thank you. Ms. Dillon. Thank you. May it please the Court. It doesn't matter what standard you apply, whether we're sticking with deliberate indifference or whether we're going with objectively unreasonable. First, I'll argue that I believe we are sticking with deliberate indifference because post-Kingsley, there have been several decisions from this Court that have still applied deliberate indifference to 14th Amendment claims regarding medical care for pretrial detainees, specifically Burton v. Downey, which was October 2015, and Davis v. Cook, which was August 2016. Based on particularly Burton v. Downey, which again came after Kingsley, district courts in all three of the states in this jurisdiction have still been applying deliberate indifference to medical claims of pretrial detainees under the 14th Amendment. Well, we have applied the objective unreasonable standard to constitutional claims of inadequate medical care in cases where the plaintiff has been detained but has yet to receive his or her probable cause hearing. I believe that's correct. So why couldn't we extend that standard to apply to those who have not yet been convicted? Because it doesn't make any sense in the medical context. To me, it doesn't matter whether they're convicted or not or have had their Gerstein hearing or not. Objectively unreasonable is the exact same thing as breaching the standard of care. And under Indiana law, if you breach the standard of care, you've done what physicians in the community find objectively unreasonable. And this Court has held, as has the Supreme Court, that federal law is not supposed to merely constitutionalize state law. Plaintiff admits in his brief on page 25 that objectively unreasonable in the federal context is identical to breaching the standard of care under Indiana tort law, but that's not what we're supposed to be doing. There's supposed to be a difference between tort law and federal law. Let me ask you about the standard of care, because this case turns on whether the standard of care requires a physician to check a patient's vital signs at regular intervals. Why isn't this a case where the standard is obvious enough that a medical expert on behalf of the defendant is unnecessary, and when you extrapolate what the expert or what the doctor said that actually treated him, when you sort of extrapolate their testimony, that that's not sufficient at least to go forward beyond summary judgment? Lay people cannot look at any patient under any circumstances and say whether or not his or her vital signs need to be checked and whether that's a requirement of the standard of care. But when you look at his behavior in the cell, doesn't that suggest that he was having medical problems? Nobody disputes he was having medical problems. The only issue plaintiff has raised is whether his vital signs needed to be monitored. Make no mistake, he was being monitored. There were two nurses on site, there were officers, and Dr. Alshami was a phone call away. He was being monitored for mental statisticians. So your position is the vital signs are irrelevant or wouldn't make any difference? Because I'm just trying to see how one gets to 98.6 is the normal temperature, and we get to 84. And so obviously, I mean, I'm not a doctor, I'm not an expert, so I don't know how quickly that happens. I don't know what kind of behavior is exhibited by the patient when there's that kind of dramatic drop, but it's pretty dramatic. Sure. I'm not saying vital signs are irrelevant or unimportant. What I'm saying is Dr. Benton Hunter, who's an emergency room specialist at Indiana University Health, has stated that Dr. Alshami's treatment orders, which did not include regular monitoring of vital signs, was within the standard of care and, i.e., was objectively reasonable. And do what plaintiff asked you to do and read the entire deposition transcripts of Drs. Light, Guffey, and Olson. None of them said the treatment or the standard of care requires vital signs be taken. They said the patient needs to be monitored. What that can include is visible signs like shakiness, sweatiness, is he eating, is he drinking, is his mental status deteriorating? And importantly enough, his mental status did deteriorate on two occasions, which are the two times the jail called Dr. Alshami and Dr. Alshami said send him to the hospital. And I want to address your question about the alcohol withdrawal protocol sheet. Plaintiff has absolutely no evidence in this case, not one document, not one witness, that testifies that that document means what plaintiff claims it means. Two nurses, two correctional officers, and Dr. Alshami have all testified consistently. That document, because ACH handles mostly rural jails in Indiana and they are small enough to where the doctor is only there one day a week, sometimes one day every two weeks. Therefore, a lot of times patients are being monitored not even by nursing staff, just by correctional officers. All the testimony of the two nurses, the two correctional officers, and the doctor, that document is created for when medical staff is not on site. A nurse looking at Mr. Collins can communicate his condition to the doctor in a much more educated, much more, in a much better way, much more meaningful way than a correctional officer because she's trained. But when officers are there and there's no nursing staff, ACH wanted to make it easier for officers to communicate an inmate's condition to the doctor or the nurse, so they created this sheet that said, you know what, before you call the doctor, before you call the nurse, take vitals, do this, do this. So that sheet is a guide, just like it says at the bottom, for non-medical staff because the whole point of not being deliberately indifferent to someone is that you're not basing your care because a piece of paper tells you how to do it. You're basing your care on your medical judgment and your experience, and nurses and doctors don't need a piece of paper to tell them how to do that, but correctional officers do. That's the only purpose of the ACH alcohol withdrawal protocol, and every witness has testified consistently about that. My yellow light is on, so I want to address briefly the Shields dissent that the plaintiff is relying on. This is not the case to revisit that issue because my understanding of the Shields issue was the plaintiff had so many treaters that he didn't really have a valid federal claim against any one person and didn't have a proper Monell claim against the company, so Judge Hambleton thought, well, this might be a fair situation because there's nobody else to pin it on and he doesn't have an adequate remedy at law. That's not the case here. Dr. Alshami is not in any way, he was the only doctor responsible for Mr. Collins while he was at the Jackson County Jail other than the two times he sent him to the hospital in 12 days. So Mr. Collins has an adequate remedy of law against Dr. Alshami. It wouldn't make any sense for this court to go revisit the Respondeat Superior issue because the result is the same. Judge Walton Pratt got it right at the district court. Whether it's deliberate indifference, Dr. Alshami did not violate his constitutional rights. Whether it's objectively unreasonable, Dr. Alshami did not violate his constitutional rights. And if those things are true, it makes no difference whether we apply Respondeat Superior or not to ACH because ACH would then get summary judgment as well. And just to reiterate, objectively unreasonable, if it's so obvious that vital signs need to be taken, I would ask the plaintiff, why didn't you just go get an expert to say that? That's all they had to do was find a doctor to rebut Dr. Benton Hunter's affidavit, and they didn't do it. They didn't even depose Dr. Hunter and challenge him on that. So it's not objectively unreasonable, and that's why we have medical experts in these cases because as laypeople, we don't know what's required and what's not. And reasonable and whether it made sense to do it is not the same as whether it's required by the standard of care. Would it have been great for his vital signs to be taken every day? Absolutely. But that is a completely different question than whether it's required by the standard of care, and it's simply not according to the undisputed evidence, and plaintiff has no evidence to rebut that. All right. Thank you, Ms. Dillon. Thank you. Mr. Saldana? We have cited in our brief a number of expert, well-respected journals or medical sources, and this Court has often recognized that that is a reliable and available source for offering medical information. Secondly, under the summary judgment standard, we're entitled to all reasonable inferences at every stage, including summary judgment. A reasonable inference could be drawn from looking at the protocol and reading the testimony of the three doctors that treated him in their entirety, as well as Dr. Alshami's testimony, that vital signs are essential in monitoring a person's condition so that you can detect at the earliest point when that person is deteriorating. There was evidence of deterioration from the monitoring, but the monitoring was by the correctional officers. The correctional officers have no duty to report this to Dr. Alshami, and, in fact, they have no duty to report it to the nurses. And, in fact, we have no evidence that they did. So when ACH attempts to delegate this to the staff, it is a mistake. I was involved with the other case in which I sued ACH and Jackson County Jail several years earlier, when they first came on board. That contract, contrary to Dr. Alshami's testimony, is used as every contract package that ACH has with all the other jails. They impose it upon them, and they, quote, supposed to train them, but they really don't. When I deposed the CEO and president of that corporation, their PowerPoint talked about cost containment and didn't even instruct on any of the protocols. Secondly, we found that they had missed a whole shift. And, in fact, if you look at the testimony of the other officers, their training is spotty because when they come on, they're not always included in the training program. They sort of learn it on the run. So it's not a real professional training as to how to use protocols. Now, all that information was not in this case. That was in another case that you tried. Was it incorporated by reference in this case? It was not, but the part about training is in this record. In other words, if you looked at the testimony of the individual officers that were part of the case, you will see that they did not have the kind of training necessary to understand the protocols. So that's the thing. I think that really my time is out. Mr. Sullivan, he did not return to the jail from hospitalization. Is that right? The first time he did return to the jail, when he was arrested, two days later, he was taken to the emergency room because of his conditions. Dr. Alshami had not seen him, but based upon reports, he agreed with the Dr. Butler, who was the second person they called. So they sent him there. They sent him back. But if you look at the testimony we cited in our briefs, Dr. Alshami could not believe that he was sent back. He said he wouldn't have done this. But he never talked to the treating physician at the hospital, which is amazing to me. No, when he made the second return to the hospital, he was what, just released? He was released, but he could barely walk. He was in a wheelchair, and he had a great deal of problems because of his deterioration. One has to wonder whether or not it was because of his alcoholism, but we specifically believe it was because he was allowed to deteriorate to a near-death condition. And that's what happens when you lock somebody in a room and you don't monitor them, and that's exactly what they did. And that is punishment, pure and simple. Any other questions? Thank you very much. I do a lot better now with this hearing aid. I know you know this, but I have this thing that I got from your clerks. Oh, good. So now I can hear everybody without any problems. I'm glad. Good. All right. Always good when technology works.